PAGE, Justice
(dissenting).
I respectfully dissent. I disagree with the court that the trial court’s errors with respect to the jury-unanimity instruction and sexual-history evidence were harmless. But I am particularly troubled by the court’s conclusion that a clergy member need not know the purpose of the meeting at which sexual penetration occurs to be found guilty of clergy sexual conduct.
I.
I begin with the issue of mens rea in the clergy sexual conduct statute, Minn.Stat. § 609.344, subd. 1(1) (2014), which prohibits sexual penetration when
the actor is or purports to be a member of the clergy, ... and:
(i) the sexual penetration occurred during the course of a meeting in which the complainant sought or received religious or spiritual advice, aid, or comfort from the actor in private; or
(ii) the sexual penetration occurred during a period of time in which the complainant was meeting on an ongoing basis, with the actor to seek or receive religious or spiritual advice, aid, or comfort in private. Consent by the complainant is not a defense....
The court’s analysis hinges solely on whether the statute would impose strict liability without an implied requirement that the clergy member must know he or she is providing spiritual counsel-. *309 Because the statute already requires knowledge of sexual penetration, the court concludes that an additional knowledge requirement for provision of spiritual counsel is unnecessary. But even if it is assumed that the statute does not impose strict liability, the court’s simplistic analysis incorrectly assumes that an additional knowledge requirement is unnecessary whenever a statute does not on its face impose strict liability.
“Mens rea is the element of a crime that requires 'the defendant know the facts that make his conduct illegal.’ ” State v. Ndikum, 815 N.W.2d 816, 818 (Minn.2012) (quoting Staples v. United States, 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)). In re Welfare of C.R.M., 611 N.W.2d 802 (Minn.2000), presented us with the question of whether to imply a knowledge requirement for the offense of felony possession of a dangerous weapon on school property, which on its face imposed strict liability.[1] We noted that knives are generally innocuous tools that “can be used for a myriad of completely benign purposes.” Id. at 810. In contrast to possession of illegal narcotics or hand grenades, which are “inherently anti-social,” mere possession of a knife “does not put owners on notice that they are engaging in conduct inherently dangerous to the public.” Id. at 806, 810. We therefore required the State to prove that the defendant “knew he possessed the knife on school property” because failure to do so would “criminalize[ ] a broad range of what would otherwise be innocent conduct.” Id. at 809-10; see also Ndikum, 815 N.W.2d at 822 (requiring knowledge of possession for the offense of possession of a pistol in public).
In State v. Benniefield we came to the opposite conclusion, holding that the crime of possession of narcotics in a school zone does not require that the defendant know he is in a school zone. 678 N.W.2d 42, 49 (Minn.2004). We stated that, unlike possession of a knife, possession' of illegal narcotics in and of itself is “‘inherently anti-social’” such that “the possessor is already on notice of the illegality of his actions, without regard to location.” Id. at 48 (quoting C.R.M., 611 N.W.2d at 810). By possessing illegal narcotics, the defendant “assume[d] the risk that he might enter a location that will make the consequences of his crime more severe.” Id. Similarly, we have held that a defendant may be convicted of first-degree burglary with a dangerous weapon without knowing he possessed the weapon because “mens rea is already required for the underlying crime — burglary; possession of a weapon merely enhances the severity of the offense.” State v. Garciar-Gutierrez, 844 N.W.2d 519, 525 (Minn.2014).
The common thread of all these cases is that a person must know the facts that make his or her conduct illegal; in other words, he or she must be “on notice” that particular conduct may be criminal. In some cases, when a person’s conduct is inherently dangerous or threatens the public welfare, no knowledge requirement is needed, and strict liability may be enforced. The possessor of an unlicensed hand grenade, for example, is on notice of a crime because “one would hardly be surprised to learn that the possession of hand grenades is not an innocent act.” Ndikum, 815 N.W.2d at 820 (quoting United States v. Freed, 401 U.S. 601, 609, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971)). Similarly, when the underlying behavior is al *310 ready criminal in nature, such as possession of illegal narcotics or possession of a dangerous weapon during a burglary, the actor is already “on notice” that he or she is committing a crime, so mens rea is not required for an additional element that subjects a person to liability for a more serious crime. See Garcia-Gutierrez, 844 N.W.2d at 525; Benniefield, 678 N.W.2d at 48. But the same cannot be said in cases in which the underlying conduct is not criminal. “[M]ere possession” of a knife or a firearm does not provide notice of a possible crime, so an additional mens rea is required. See C.R.M., 611 N.W.2d at 806; Ndikmn, 815 N.W.2d at 822.
Thus, even if the clergy sexual conduct statute does not impose strict liability, that is not the end of our analysis, as the court appears to believe. Instead, we must determine whether an additional mens rea is necessary to put a member of the clergy on notice that his or her conduct may be criminal. The court asserts that because we require knowledge of sexual penetration, an additional knowledge requirement is unnecessary. But sexual penetration between consenting adults is ordinarily innocuous behavior — even constitutionally protected behavior in most cases. See Lawrence v. Texas, 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). Indeed, the court does not contend that sexual conduct involving members of the clergy is inherently dangerous, nor that it is by itself a criminal act. Mere knowledge of sexual penetration therefore does not put a clergy member “on notice” that his or her actions may be criminal. Like possession of a knife, which is not criminal until it occurs within a school zone, sexual penetration by a member of the clergy is not criminal unless and until it coincides with a meeting at which spiritual counsel is sought or received.
The clergy sexual conduct statute is wholly different from the statutes at issue in Benniefield and Garcia-Gutierrez. In those cases, the defendant was already on notice that his underlying conduct was criminal, and we refused to imply a mens rea requirement with respect to the additional element that enhanced the sentence. Here, providing spiritual counsel does not “merely enhance!] the severity of the offense.” See Garcia-Gutierrez, 844 N.W.2d at 525. Rather, providing spiritual counsel is the act that makes the conduct criminal. Without spiritual counsel, there is no crime. The State must therefore prove that the clergy member knew, or at least had reason to know, that spiritual counsel was being sought.
The court’s analysis is especially troubling because the clergy sexual conduct statute is markedly different from most other statutory rape offenses. First, statutory rape offenses generally protect a discrete class of people with a particular vulnerability, such as age or disability. See, e.g., Minn.Stat. § 609.342, subd. 1(a) (2014) (protecting complainants under 13 years of age who are more than 3 years younger than the actor). The clergy sexual conduct statute has no such limiting characteristic. Although the statute was enacted to prevent clergy from taking advantage of their parishioners, any person can assert a violation of the clergy sexual conduct statute. And because a clergy member need not know that he or she is providing spiritual counsel under the court’s interpretation, a violation of the statute could arise from any nonmarital sexual conduct with any person, even though most such relationships would be consensual and otherwise lawful. The statute effectively bars clergy members from engaging in nonmarital sexual conduct and “criminalizes a broad range of what would otherwise be innocent conduct.” C.R.M., 611 N.W.2d at 809-10. In *311 addition, the court’s holding today exacerbates the constitutional deficiencies of the clergy sexual conduct statute. See State v. Wenthe, 839 N.W.2d. 83, 96 (Minn.2013) (Page, J., dissenting).
Moreover, most types of statutory rape are based on characteristics that are readily apparent, such as the complainant’s age or a special relationship between the actor and complainant. The only unifying characteristic under the clergy sexual conduct statute is that the complainant seeks or receives spiritual counsel. This trait is wholly subjective and may be impossible for the clergy member to ascertain. The court suggests that a more focused definition from the Legislature of “religious or spiritual advice, aid, or comfort” would alleviate this concern. Of course, that will not help those clergy, like Wenthe, who are subject to the statute as it reads today. Moreover, even if the Legislature were inclined to clarify the statutory language, clarified language by itself will not necessarily address the real issue here: because a violation of the statute may turn on the complainant’s subjective interest, clergy members will lack notice that their actions may be criminal. A knowledge requirement, by contrast, would subject clergy members to criminal penalties only if they knew or had reason to know that a particular sexual relationship may pose a risk of violating the statute.
As a consequence, the court’s interpretation of the clergy sexual conduct statute may result in a guilty verdict based entirely on what the complainant thought. By contrast, the elements of other statutory rape offenses are proven by more objective standards. See, e.g., MinmStat. § 609.344, subd. l(a)-(b), (e) (complainant’s age); id., subd. 1(d) (complainant is mentally impaired); id., subd. l(f)-(g) (actor and complainant have a “significant relationship”); id., subd. l(h)-(j) (actor is a psychotherapist and complainant is a patient or former patient). I can think of no other criminal offense in which the complainant’s subjective beliefs, without more, can provide proof of a crime beyond a reasonable doubt. A.F.’s understanding of the relationship is, of course, relevant — but so is Wenthe’s. Under the court’s interpretation of the clergy sexual conduct statute, the clergy member’s subjective belief regarding the provision of spiritual counsel is ignored, whereas the complainant’s subjective belief that such counsel was sought or received may constitute the sole evidence to support a conviction. This outcome is contrary to our case law and ignores the very purpose of mens rea, which ensures that an actor “know[s] the facts that make his conduct illegal.” See Ndikum, 815 N.W.2d at 818 (quoting Staples, 511 U.S. at 606, 114 S.Ct. 1793). A requirement that the clergy member know, or have reason to know, that spiritual counsel is sought will ensure that both the complainant’s and clergy member’s states of mind are considered.
Finally, the court acknowledges that, without an additional knowledge requirement, a clergy member may sometimes lack notice of the potential criminality of his or her actions. This possibility, which sounds like a classic case of strict liability, does not bother the court because, in its view, regardless of what Wenthe believed, the evidence is “more than sufficient” that Wenthe provided spiritual counsel to A.F. and had notice that his actions may be criminal. But the court’s concern that there is a notice problem with the statute demonstrates that knowledge of spiritual counsel is necessarily a part of the clergy sexual conduct statute, regardless of whether, in this particular case, other facts support Wenthe’s guilt. The court also ignores the fact that a felony statute lacking an adequate mens rea requirement may violate the Due Process Clause, re *312 gardless of the specific circumstances at issue. See, e.g., State v. Guminga, 895 N.W.2d 344, 346 (Minn.1986) (declaring unconstitutional a statute that subjected a defendant to imprisonment when the defendant’s employee sold liquor to a minor without the defendant’s knowledge).
Moreover, in downplaying the notice requirement in this ease, the court relies on facts that may illuminate Wenthe and A.F.’s past relationship, but that tell us little, if anything, about the purpose of any of the meetings at which sexual penetration occurred and for which Wenthe may have been convicted. Wenthe testified that the relationship “changed very quickly” before the first sexual encounter; evidently, the jury was receptive to this defense, as Wenthe was acquitted of the ongoing-basis count. At bottom, the court’s interpretation of Minn.Stat. § 609.344, subd. 1(1), encourages juries to consider past behaviors rather than the evidence most germane to the spiritual-counsel element: the defendant’s subjective belief as to whether spiritual counsel was sought at the meeting at which the sexual penetration occurred. I would therefore affirm the court of appeals on this issue and remand for a new trial.
II.
I also dissent from the court’s conclusions with respect to the trial court’s failure to give a unanimity jury instruction and the exclusion of evidence relating to A.F.’s sexual inexperience.
A.
First, I disagree with the court’s conclusion that the failure to provide a specific-unanimity jury instruction did not affect Wenthe’s substantial rights. The court does not decide whether the trial court committed plain error by not giving the instruction.[2] Instead, the court affirms the conviction because “it is not reasonably likely that the district court’s failure to provide a specific-unanimity jury instruction significantly affected the verdict.” In doing so, the court notes that a specific-unanimity instruction would have informed the jury that it must agree on the specific meeting at which Wenthe violated the clergy sexual abuse statute. Therefore, the court reasons that the failure to provide the instruction significantly affected the verdict only if it is reasonably likely that the jury did not agree on a specific meeting at which Wenthe sexually penetrated A.F. and provided spiritual counsel. The court reasons that the alleged error was harmless because the evidence admitted at trial overwhelmingly related to the first meeting on November 13, 2003, leaving no reasonable possibility that some jurors could have believed Wenthe violated the statute at a later meeting but not on November 13.[3]
But that reasoning merely begs the question. Just because the jurors unanimously agreed that Wenthe violated the statute does not necessarily mean that the jurors unanimously agreed on the element of the offense that requires that “the sexual penetration occurred during the course *313 of a meeting in which [A.F.] sought or received religious or spiritual advice, aid, or comfort from [Wenthe].” Minn.Stat. § 609.344, subd. l(Z)(i) (emphasis added). According to the criminal complaint, the timeframe during which this element could have been met spanned from November 1 to December 31, 2003, yet the record before us is not at all clear as to the specific meeting or meetings at which Wenthe and A.F. engaged in sexual contact and at which A.F. sought or received religious or spiritual advice, aid, or comfort. Given this record, and the fact that the jury instructions merely stated that the offense had to have occurred during “a meeting” and that the verdict “had to be unanimous,” but did not say that the jurors had to unanimously agree on the date that the meeting occurred, it is possible, and perhaps likely, that the jurors unanimously agreed that Wenthe had violated the statute at a single meeting without having unanimously agreed on the specific meeting at which the violation occurred. For example, it is possible, given the less-than-clear record before them, that some jurors may have determined that Wenthe and A.F. engaged in sexual activity and that A.F. sought or received spiritual advice, aid, or comfort at the November 13 meeting but not on November 14, while others may have determined the opposite, that Wenthe and A.F. engaged in sexual activity and A.F. sought religious or spiritual advice, aid, or comfort at the meeting on November 14 but not on November 13.[4]
Compounding the trial court’s failure to give a unanimity instruction is the State’s invitation to the jury to disregard the single-meeting element of the offense, stating in closing argument that Wenthe was guilty if any meeting involved both sexual penetration and spiritual counsel. Applying the State’s closing argument, the jury’s members could easily have decided that Wenthe violated the statute without seriously considering the precise date on which the violation occurred, or they could have ignored the single-meeting element and relied on different dates to reach a “unanimous” result.
Reversal is also necessary to ensure the fairness, integrity, and public reputation of the judicial proceedings. See State v. Griller, 583 N.W.2d 736, 740, 742 (Minn.1998). Not only did the trial court’s instruction misstate the law, but the court allowed the State to add further confusion by implying that the date of the single meeting was irrelevant. Given the uncertainty surrounding the knowledge requirement for the spiritual-counsel element, the jury lacked sufficient direction in its evaluation of the two genuine issues in this trial: did Wenthe provide spiritual counsel on or after November 13, 2003, and did that counseling occur at a meeting that involved sexual penetration? These errors, especially when considered in combination with the trial court’s exclusion of sexual-history evidence (discussed below), call into considerable question the fairness, integrity, and public reputation of the judicial proceedings.
B.
I would also conclude that the trial court denied Wenthe his right to a fair trial *314 when it refused to admit his proffered sexual-history evidence. I agree with the court that the State should not have offered evidence of A.F.’s sexual inexperience, and the State’s reference to A.F. as “naive, vulnerable, [and] inexperienced” in closing arguments was particularly inexcusable. The court’s admission of the State’s evidence violated the rape-shield law because it was irrelevant, it was prejudicial to Wenthe, and it gave the jury a false impression of A.F.’s sexual history. The court concludes, however, that Wenthe’s evidence of AF.’s sexual experience was equally irrelevant and prejudicial, and therefore that Wenthe’s evidence was inadmissible notwithstanding the error in admitting the State’s evidence. See Minn. R. Evid. 403 (providing that relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice”).
I depart from the court’s conclusion that the trial court’s error does not merit a remedy. We have held that the rape-shield law must give way when “admission is constitutionally required by the defendant’s right ... to offer evidence in his own defense.” State v. Benedict, 397 N.W.2d 337, 341 (Minn.1986); see also State v. Valtierra, 718 N.W.2d 425, 436 (Minn.2006) (allowing a party to introduce inadmissible evidence when an opposing party “opens the door” to the evidence). We have recognized that “the right to present a defense encompasses the right to offer the testimony of witnesses so that the defense can present its version of the facts to the jury as well as the state so that the jury can decide where the truth lies.” State v. Quick, 659 N.W.2d 701, 713 (Minn.2003) (citing Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). Because Wenthe was significantly older than A.F. and served as her priest, the State’s sexual-history evidence fed into an already-existing bias against Wenthe that he enjoyed greater authority over A.F. than may have actually existed. The evidence also served to buttress A.F.’s credibility on the critical question of whether the meeting included a spiritual counseling component. This was certainly the State’s intention, whether it intended to violate the rape-shield law or not. Thus, once the State opened the door to evidence of A.F.’s sexual history, Wenthe should have been afforded the right to present evidence rebutting this perception by demonstrating that A.F. was more experienced sexually than the State’s evidence suggested.
I also disagree that the trial court’s error was harmless beyond a reasonable doubt. The sole disputed issue in this case was whether Wenthe and A.F. met for a spiritual or religious purpose. Wenthe’s defense was that his association with A.F. began as a priest-parishioner relationship, but that it had evolved before the first instance of sexual penetration. Given the evidence of A.F.’s sexual history presented by the State, Wenthe’s rebuttal evidence is highly probative of whether the meeting at which the two had sexual contact included a spiritual counseling component.
The brief reference to past sexual partners in A.F.’s testimony does not diminish the relevance of Wenthe’s rebuttal evidence,- as the court suggests. The numerous references to A.F.’s sexual inexperience outweigh the single sentence that alluded to other sexual partners. Inexplicably, the court views A.F.’s offhand reference to previous sexual partners as equally probative to Wenthe’s opportunity to call attention to A.F.’s sexual history and draw reasonable conclusions from that history. I would conclude that this brief reference was insufficient to undo the prejudice caused by the State’s introduction of inadmissible evidence.
*315 The trial court afforded the State an unfair advantage by admitting misleading evidence of A.F.’s sexual inexperience, and the proper remedy was to allow Wenthe to admit rebuttal evidence; The trial court’s failure to do so denied Wenthe’s right to a fair trial.
For the above reasons, I respectfully dissent.

. In 2003, the Legislature amended the statute to include a knowledge requirement consistent with our opinion in C.R.M. See State v. Benniefield, 678 N.W.2d 42, 48 n. 3 (Minn.2004).

. Given the 2-month timeframe for the single-meeting count, and the specific language of the clergy sexual conduct statute, which requires that the offense must occur during "a meeting,” I would conclude that the trial court committed plain error.

. In support of this theory, the court appears to argue that all of the testimony centers around the November 13 meeting, but the court later argues that the November 13 meeting is indistinguishable from the November 14 meeting and future meetings. These inconsistent theories in fact support my contention that we cannot say with any reasonable accuracy what the jury relied on to reach its decision.

. There is evidence to suggest that A.F. sought or received advice, aid, or comfort from Wenthe on both November 13 and November 14. It is entirely unclear from the record, however, whether the advice, aid, or comfort sought was religious or spiritual in nature. Given that the jury acquitted Wenthe of some of the charges against him, it is fair to say that the jury believed and disbelieved parts of Wenthe’s and A.F.'s testimony. On that basis, and given the lack of clarity in the record, it is not possible to say with any certainty that the jurors unanimously agreed on the specific meeting at which all of the elements of the offense were met.